## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL CASE NO.** |
| **v.** | **1:22-CR-00091-2-SCJ** |
| **ANTWUN JOHNSON,** | |
| **Defendant.** | |

## <u>ORDER</u>

This matter appears before the Court on the Report and Recommendation ("R&R") filed by the Honorable Linda T. Walker, now-retired United States Magistrate Judge. Doc. No. [304]. [1] In the R&R, Judge Walker recommends that Defendant Antwun Johnson's Motion to Suppress Evidence (Doc. No. [120]) and Motion to Suppress Statements (Doc. No. [121]) be denied.

The facts and procedural history are found in the R&R and are incorporated by reference with some modification to address Defendant's objections. Doc. No. [304].

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

As stated in the R&R, in June 2021, Captain Greg Sparacio of the Cartersville Police Department was assigned to a Drug Enforcement Administration ("DEA") Task Force that was conducting a long-term wire-tap investigation of drug activity in the metropolitan Atlanta area. Doc. No. [272], Jan. 6, 2025, Hrg. Tr., 12–13.[2] During the investigation, Sparacio identified Kevin Bolton as an individual involved in the distribution of narcotics in the area,[3] and he obtained a wiretap of Bolton's cellphone. Id. at 13–15.

Between June 19 and June 23, 2021, Sparacio's team intercepted (by wiretap) several calls between Bolton and an unknown male later identified as Defendant Antwun Johnson, who the agents determined was a supplier for Bolton. Id. at 15. Bolton indicated in those calls that he wanted to purchase two kilograms of cocaine (what Bolton referred to in coded language as a "two-piece") from the supplier for approximately $35,000 per kilogram in a transaction planned for the morning of June 24, 2021, at the supplier's apartment on Buffington Road. Id. at 19–24, 26–27. The team devised a plan to use a pole

---

[2] These page number citations are to the actual transcript pages, not the imprinted numbers on CM/ECF.

[3] Sparacio also testified in the affirmative that an investigation revealed that it was Bolton who had supplied narcotics to co-defendants, Deidra Anderson and Guy Blackshear. Doc. No. [272], Hrg. Tr. 14:12–15:6.

2

camera near Bolton's house combined with physical and electronic surveillance to follow Bolton to the suspected meet-up with the supplier. Id. at 15–19, 28, 30. Based on information obtained in the intercepted calls, the team believed Bolton was going to bring his aunt, Pamela Givens, an individual agents knew from previous investigation was a drug tester, to the transaction. Id. at 26, 31–32.

Implementing the above plan, the team set up a pole camera near Bolton's home that agents and officers could access on their cell phones for real time surveillance, while continuing to monitor Bolton's phone calls through the wiretap. Id. at 30, 32, 73. Team members also created a WhatsApp group chat called "Kevin Bolton Search Warrant" to communicate about the operation, share information learned through the wiretap and pole camera, and assist in their plan to obtain and execute a search warrant on Bolton's home. Id. at 73–74, 127. The WhatsApp group included members of the Georgia State Patrol ("GSP") who were recruited to stop the vehicles of the suspects in the investigation. Id. at 60, 75. In addition to using the WhatsApp chat, DEA agents and GSP officers involved in the operation communicated by telephone and mobile radio. Id. at

33. The officers in communication that day included Motor Carrier Officer Micaihah Swain[4] and GSP Lieutenant Charles Chapeau. Id. at 33–34, 60.

On the morning of June 24, 2021, DEA agents conducted electronic surveillance on Bolton as he picked up Givens. Id. at 31–32. GSP Officer Tiffany Hayes Chambers, who was part of the group conducting the operation, subsequently messaged the WhatsApp chat group that Bolton, accompanied by Givens, was leaving his home in a van with an image of a bumblebee on its side. Id. at 79, 85–86, 94. Upon receipt of this information, Sparacio followed Bolton's van to an apartment complex off Buffington Road in Union City. Id. at 34. Although he temporarily lost sight of Bolton's van as it entered and drove deeper into the complex, Sparacio eventually located the van in the complex parking lot, parked in front of one of the apartment buildings. Id. at 35–36, 38–39. Sparacio parked his own vehicle around the corner from Bolton's van where he could observe the surrounding apartments. Id. at 35, 38, 87. From this vantage point, Sparacio saw that Givens was on the balcony of one of the apartments in the building. Id. at 39. Sparacio testified that the three individuals were inside the

---

[4] Officer Swain clarified that while he is not a Georgia State Trooper, he is a "state officer" and works for a division of the Georgia Department of Public Safety. Doc. No. [272], Tr. 154:17–24.

apartment for approximately forty-five minutes, after which Bolton and Givens emerged with Givens wearing a fanny pack or backpack purse. Id. at 94, 106–08.

At some point during his surveillance, Sparacio saw Bolton, Givens, and Johnson meet at Bolton's van in the parking lot. Id. at 53. Bolton and Givens then left the complex in Bolton's van, and the agents split up so that some agents followed Bolton's van while Sparacio and other agents continued to surveil the apartment Bolton and Givens had been seen leaving. Id. at 57–58. "[W]ithin 30 to 45 minutes, an hour at most," Sparacio saw Johnson leave the apartment carrying a small black duffle bag, enter a black Lexus, and exit the complex. Id. at 58–59, 97. [5] Sparacio followed the Lexus while also contacting and requesting Officer Swain to stop the vehicle. Id. at 98–99.

According to Sparacio, the plan for the operation was to have DEA agents follow the Lexus until GSP troopers could catch up and initiate a traffic stop. Id. at 61. Sparacio testified that "we needed the state patrol to ultimately stop the vehicle and see if there was more narcotics or if that was the money from our

---

[5] The magistrate judge's original finding of fact has been modified to address Defendant's objection to use of the word "shortly" to describe the timeframe at issue. Doc. No. [306], 8. Even with this change and after *de novo* review, the magistrate judge's probable cause finding remains correct.

drug transaction." Id. at 61.[6] When asked why he would have the Georgia State Patrol come in and conduct the stop, Sparacio testified that it is because the Georgia State Patrol have state-wide jurisdiction "so if we were to go through multiple jurisdictions, then our surveillance are able to stay with us. And . . . we don't have to worry about different agency policies." Id. He also testified that the reason for the State Patrol is also that "[i]f someone were to run, the Georgia State Patrol would handle it or however it fits their policy." Id. Sparacio also testified in the affirmative when asked" if as part of your operation, was the goal to effect a traffic stop if traffic infractions were observed?" Id. a 61–62. When asked why, Sparacio testified that "we were confident that a narcotics transaction had taken place. And, one, we wanted to confirm the driver's identity just to be a hundred percent sure because someone could look like somebody . . . ." Id.

---

[6] The magistrate judge's original finding of fact has been modified to address Defendant's objection to the magistrate judge's characterization of "the plan for stopping Mr. Johnson's vehicle as being for safety and to maintain the secrecy of the investigation." Doc. No. [306], 8. The Court is unable to uphold Defendant's argument that the change to the facts to show that the stop of Defendant's vehicle was to be based on a traffic violation "contradicts the Magistrate's finding that Swain and Chapeau had probable cause to effect the traffic stop based on collective knowledge of the drug investigation." Doc. No. [306], 9. This is because both reasons for probable cause can be true. There can be probable cause based on collective knowledge and a second basis for probable cause based on a traffic violation.

Swain, who at the time was staged nearby with Chapeau awaiting further instructions, was given a description of the Lexus, a license plate number, and the direction the vehicle was traveling, and he was told there was a black duffle bag in the vehicle. Id. at 164–65.

After following the Lexus for a short time, Swain caught up with the vehicle and initiated a traffic stop. Id. at 130. Swain testified that he observed two traffic infractions while following the Lexus: a window tint violation and failure to maintain lane. Id. With his dashboard camera activated, Swain pulled behind the Lexus, which safely pulled over to the side of the road. Id. at 131. The stop occurred on West Lake Drive in Fayette County. Doc. No. [296], June 27, 2025 Hrg. Tr. at 33. In addition to Swain, Chapeau was present at the traffic stop in his own patrol car. Doc. No. [272], 136.[7] Video from Chapeau's dashcam shows Swain approach Johnson's vehicle from the passenger side and ask him several questions through the passenger window, including where he was coming from, where he worked, and where he was going. Id. at 177. During the questioning, Swain observed the black duffle bag inside the vehicle. Id. at 134. Swain asked

---

[7] A third officer, Lieutenant Matthews, also subsequently arrived. Doc. Nos. [272], Tr. 159:22–23; [296], Tr. 40:12–16.

Johnson to exit the vehicle so he could write him a warning for the traffic violations he observed, and Johnson complied. Id. at 135, 178.

Chapeau then walked up and, after noticing a bulge in Johnson's waistband, asked if Johnson had a firearm. Id. at 136–37, 182. Johnson answered in the affirmative, and he was handcuffed and detained while the officers removed his firearm and searched and further questioned him. Id. at 182, 185. The officers questioned Johnson for approximately five minutes, asking about his itinerary for the previous few days, among other things. Id. at 186.

About seven minutes into the stop, Swain asked if there was anything illegal inside his vehicle and requested and obtained Johnson's consent to search the vehicle. Id. at 141–42. Swain went to his patrol car to print out a search consent form, but when he emerged from the car, Johnson asked what would happen if he did not consent to the search. Id. at 192. Swain, a trained K-9 handler, responded that he would run his trained drug-sniffing dog around the car. Id. Johnson subsequently revoked his consent to the search, and Swain had his dog, Ozon, perform an open-air sniff of the Lexus. Id. at 143–44, 146, 193. The dog alerted to the presence of narcotics near the front passenger seat of Johnson's vehicle. Id. at 146. Meanwhile, Chapeau deployed his tint meter on the windows

8

of the Lexus and determined that the tint was darker than the legal limit. Id. at 144, 191.

Following the open-air sniff, Swain informed Johnson that there was a positive indication of narcotics in the vehicle and, as a result, that he was going to search the Lexus. Id. at 147. Johnson denied there were narcotics in the vehicle, but responded upon being questioned by Swain that he had some money in the vehicle and did not know where the money had been, meaning it could have been around narcotics. Id. The officers subsequently searched the vehicle and seized the duffel bag from the front passenger floorboard, which contained approximately $69,000 in cash. Id. at 153. Chapeau notified DEA agents about what the officers discovered, and the agents responded with a request to detain Johnson. Id. at 148, 153. Prior to the arrest, Swain did not smell alcohol or marijuana on Johnson or in the vehicle or notice any indicia of impairment, and he did not receive any information indicating that the car was stolen or that there were any warrants or holds on Johnson. Id. at 178–79.[8]

_____

[8] There was also testimony that at 10:37 a.m., it was relayed to the team that an intercepted call showed that Bolton had confirmed receipt of two kilos of cocaine to another associate. Doc. No. [272], 111; however, there was only a proffer by the Government that this phone call took place prior to the search of Defendant's vehicle. Id. at 109. There is also some evidence which indicates possible contemporaneousness. See, e.g., Doc. No. [296], 55 (testimony in response to questing concerning 10:44:53 chat

In March 2022, a federal grand jury indicted Johnson and six others on drug distribution conspiracy charges related to the trafficking of narcotics in and around the Atlanta metropolitan area. Doc. No. [1]. After his arraignment and detention, Johnson filed motions to suppress evidence collected and statements he made during the June 24, 2021 traffic stop. Doc. Nos. [120]; [121]. The magistrate judge held evidentiary hearings on the motions on January 6, 2025 and June 27, 2025.[9] See January 6, 2025 Docket Entry and June 27, 2025 Docket Entry. The Parties then submitted exhibits and post-hearing briefs. Docs. Nos. [299], [300], [301], [302].

On September 25, 2025, the magistrate judge entered a R&R recommending denial of the pending motions to suppress. Doc. No. [304].

---

about money found). The magistrate judge did not use this evidence in the probable cause analysis. The Court will do likewise and focus on the remaining facts.

[9] The Court has also carefully reviewed the transcript of the hearings before the magistrate judge (Doc. Nos. [272]; [296]), exhibits, as well as the briefing and the full record. See United States v. Elsoffer, 644 F.2d 357, 358 (5th Cir. 1981) (per curiam) (holding that the district judge must also "read the transcript of the hearing before a magistrate on a motion to suppress, before adopting the magistrate's recommendation."); Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), (adopting as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit).

Defendant thereafter filed objections to the R&R. Doc. No. [306]. Defendant's objections to the R&R are: (1) there was no probable cause for the stop of his vehicle as the magistrate judge's findings were inconsistent with the record and the collective knowledge doctrine did not provide probable cause; (2) law enforcement exceeded the scope of the traffic stop; and (3) all of Defendant's statements from the point that he was in handcuffs are inadmissible at trial. Id.

## I.     LEGAL STANDARD

This Court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which" a party objects. 28 U.S.C. § 636(b)(1)(C). The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." Id. And this Court may "receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

The Court now considers Defendant's objections in turn.

## II.     OBJECTION 1

As stated above, Defendant's first objection is that there was no probable cause for the stop of his vehicle as the magistrate judge's findings were inconsistent with the record and the collective knowledge doctrine did not

provide probable cause. Doc. No. [306]. Defendant also states that "[t]he events leading up to the stop of [him] do not indicate that law enforcement had probable cause for [Motor Carrier Officer Swain] to believe that [Defendant] had just completed and possessed proceeds from an unlawful drug transaction." Id. at 6.

As recently stated by the Eleventh Circuit, "[p]robable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment." Harris v. Hixon, 102 F.4th 1120, 1126 (11th Cir. 2024) (quoting Washington v. Howard, 25 F.4th 891, 898 (11th Cir. 2022)). "Probable cause exists if the totality of the circumstances could persuade a reasonable officer that there is a 'substantial chance of criminal activity by the person who is arrested.'" Id. (citations omitted). "A substantial chance is all that is required, not an actual showing of such activity." Id. (citations and quotations omitted). "Probable cause is not a high bar." Id. (quoting District of Columbia v. Wesby, 583 U.S. 48, 57 (2018). In addition, "[b]ecause behavior may seem innocent to the untrained eye, courts must also consider the officer's observations and experience." United States v. Warren, 459 F. App'x 812, 815 (11th Cir. 2012).

After de novo review, the Court upholds the magistrate judge's probable cause determination (based on the drug-related criminal activity and collective knowledge of all the officers involved in the stop) as correct in fact and law. The

Court is unable to uphold Defendant's "bare suspicion of criminal activity" arguments, based *inter alia* on the absence of observation of Bolton or Givens leaving their respective residences with a large amount of currency. The Court's independent research yields authority showing that probable cause can be found even if a Defendant is not observed handling the contraband. Cf. United States v. Irurzun, 631 F.2d 60, 63 (5th Cir. 1980) [10] ("[A]lthough agents did not see [defendant] handling cocaine, we find that probable cause existed for his arrest. Accordingly, the judgment of the district court is affirmed."); see also United States v. Smith, 308 F.2d 657, 662–63 (2d Cir. 1962) ("[Seller] set up a rendezvous between his source of supply and agent . . . at 131st Street and Seventh Avenue. Appellant turned up at the appointed place at the appointed time. This fact alone is an important factor in determining probable cause.")[11] And while Defendant is correct that no one observed Bolton or Givens leaving with kilograms of suspected cocaine, they did observe Givens leaving with a small fanny pack or backpack purse and the Defendant leaving with a small duffle bag. To the extent

---

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered prior to the close of business on September 30, 1981 by the United States Court of Appeals for the Fifth Circuit.

[11] The Court recognizes that this case is non-binding, persuasive authority.

that Defendant's argument ignores these aspects of the totality of the circumstances, the objection is overruled.

As for the remainder of Defendant's objection, while not entirely clear, it appears that Defendant's statement in his objection that the magistrate "unquestionably accepted as fact" Sparacio's testimony and arguments about contradictions and discrepancies in Sparacio's testimony, goes to the magistrate judge's credibility determinations. Doc. No. [306], 7,

By the way the magistrate judge wrote the factual section of the R&R, it can be implied that the magistrate judge accepted Sparacio's testimony despite Defense Counsel's attempts to show inconsistent statements through a comparison of the hearing testimony and the testimony at a Fayette County magistrate court/state-level hearing. And while Defendant did point to contradictions/discrepancies in Sparacio's testimony (i.e., concerning whether the surveillance officers saw Bolton and Givens walk into the building and whether Defendant was under arrest at the time Sparacio went to the scene), there was nothing to indicate intentional deception as even the Eleventh Circuit recognizes in its pattern jury charge concerning impeachment of witnesses due to inconsistent statements that "a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it." Eleventh Cir. Pattern Jury

Instructions (Criminal Cases) Instruction No. B6.1 (2025); <u>cf.</u> <u>Sims v. United States</u>, No. 1:08-CR-0209-CC-JSA, 2013 WL 1773817, at *8 (N.D. Ga. Mar. 27, 2013), <u>report and recommendation adopted</u>, No. 1:08-CR-0209-2-CC, 2013 WL 1773726 (N.D. Ga. Apr. 25, 2013) ("[A]ll Petitioner points to as proof of perjury are [the witness's] prior allegedly inconsistent statements. But these statements do not mean that [the witness's] trial testimony was false . . . .").[12] The fact that Sparacio also attempted to make an explanation of possible misunderstanding (Doc. No. [272], 103:20) is also taken into account. <u>Cf.</u> <u>Palmer v. Robbins</u>, No. 4:19-CV-167, 2023 WL 113049, at *6 (S.D. Ga. Jan. 5, 2023), <u>aff'd</u>, No. 23-10433, 2023 WL 5786381 (11th Cir. Sept. 7, 2023) ("While [witness's] inconsistent statements certainly would be a basis for the jury to question his credibility, it is entirely within the jury's discretion to accept [the witness's] explanation at trial for his earlier conflicting statements and find him credible.").

"'[T]o adequately determine the credibility of a witness . . . the fact finder must observe the witness.'" <u>United States v. Powell</u>, 628 F.3d 1254, 1257 (11th Cir. 2010) (citing <u>Louis v. Blackburn</u>, 630 F.2d 1105, 1110 (5th Cir. 1980)). "This

---

[12] The Court recognizes that "this Circuit's pattern instructions, while a valuable resource, are not binding law." <u>United States v. Carter</u>, 776 F.3d 1309, 1324 (11th Cir. 2015).

requirement is satisfied 'either by the district judge accepting the determination of the magistrate after reading the record, or by rejecting the magistrate's decision and coming to an independent decision after hearing the testimony and viewing the witnesses.'" Id. (citation omitted).

Here, the Court has read the record[13] and after reading the record, the magistrate judge's credibility determinations (as implied by the way the background facts were written) are accepted.[14] The Court is not required to rehear the testimony on which the magistrate judge's findings and recommendations are based to make an independent evaluation of credibility. United States v. Raddatz, 447 U.S. 667, 673 (1980).[15]

---

[13] "The statutory obligation of the district court to give independent consideration to those portions of the R&R to which objection is made does require the court to consider the actual testimony relevant to the objections, and not merely the R&R." United States v. Dorvilus, 357 F. App'x 239, 245 (11th Cir. 2009).

[14] In making this determination, the Court draws guidance from the case of Thompson v. Wainwright, 784 F.2d 1103, 1105 (11th Cir. 1986) in which the Eleventh Circuit appeared to reject a litigant's request for remand because the magistrate judge's R&R did not contain "specific credibility choices." In Thompson, the Eleventh Circuit stated: "[a]lthough it is true the magistrate did not articulate detailed findings on every disputed fact, the Report and Recommendation clearly states his findings, supported by record references . . . ." Id. Similarly, here, the R&R's findings are supported by record references.

[15] While the Court recognizes that 28 U.S.C. § 636 provides the option of recommitting this matter to the magistrate judge for direct credibility findings, such is not an option, here, due to the retirement of the formerly assigned magistrate judge. See also Louis v. Blackburn, 630 F.2d 1105, 1109 (5th Cir.1980) ("[T]he district judge should not enter an

Further even if the credibility arguments were sustained (which this Court does not do), the Court finds that the Government's arguments (Doc. No. [300], 9–11) regarding an alternative basis for probable cause for the stop of Defendant's vehicle are correct. The Court finds that there was probable cause to stop Defendant's vehicle based on the two traffic violations observed by Officer Swain: weaving/failure to maintain lane and window tint in violation of O.C.G.A. § 40-8-73.1.[16] Georgia courts have held under Georgia law that

―――――――――――――

order inconsistent with the credibility choices made by the magistrate without personally hearing the live testimony of the witnesses whose testimony is determinative.").

[16] The Eleventh Circuit has recently clarified that only reasonable suspicion is needed for a traffic stop as follows:

> A traffic stop is a seizure within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809–10, 116 S. Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). And to comply with the Fourth Amendment, an officer must have reasonable suspicion. Heien v. North Carolina, 574 U.S. 54, 60, 135 S. Ct. 530, 536, 190 L.Ed.2d 475 (2014) ("All parties agree that to justify [a traffic stop], officers need only reasonable suspicion[.]" (quotation omitted)). In other words, an officer making a stop must have "a particularized and objective basis for suspecting the person stopped of criminal activity." Navarette v. California, 572 U.S. 393, 396, 134 S. Ct. 1683, 1687, 188 L.Ed.2d 680 (2014) (alteration adopted) (quotations omitted). Even minor traffic violations qualify as criminal activity.

United States v. Campbell, 26 F.4th 860, 880 (11th Cir. 2022); see also id. n.15 ("But the Supreme Court has since made clear that reasonable suspicion is all that is required.") (citing Heien v. North Carolina, 574 U.S. 54, 60 (2014)).

"weaving within a lane may be justification for a traffic stop because it could indicate that the driver is under the influence of alcohol." State v. Durr, 274 Ga. App. 438, 439, 618 S.E.2d 117, 119 (2005); see also United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) ("[L]aw enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.'") (citing United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990)); United States v. Harris, 928 F.2d 1113, 1116 (11th Cir. 1991) (holding that the district court did not err in finding traffic stop for weaving valid).

Next, the Defendant asserts that it was only a suspicion on the part of law enforcement and "never proven as fact" that the telephone conversation between Bolton and at the time, an unknown individual, was for the purpose of arranging a purchase of cocaine and that "two-piece" clearly meant a purchase of cocaine or that Givens was a drug tester. Doc. No. [306], 7.

A review of the record shows that Sparacio was asked, in his capacity as a DEA Task Force officer, to testify to what he found relevant from the phone calls that used coded language. Doc. No. [272], Tr. 19. The Eleventh Circuit has held that even if an officer "had testified regarding the meaning of specific code words

18

in the intercepted calls, his testimony would have been proper lay testimony under our case law." United States v. Jones, 657 F. App'x 938, 946 (11th Cir. 2016).[17] The Eleventh Circuit has also held that "an officer's investigation can provide sufficient foundation for an opinion that would otherwise require technical expertise." United States v. Williams, 865 F.3d 1328, 1342 (11th Cir. 2017).

In light of this authority, Defendant's objections to Sparacio's testimony concerning the coded language and Givens as a tester are **OVERRULED**.

## III.    OBJECTION 2

As stated above, Defendant's second objection is that law enforcement exceeded the scope of the traffic stop. Doc. No. [306].

"Even if the police have reasonable suspicion to make a traffic stop, they do not have unfettered authority to detain a person indefinitely." United States v. Campbell, 26 F.4th 860, 881 (11th Cir. 2022). "The detention is 'limited in scope and duration.'" Id. (citation omitted). "And officers cannot unlawfully prolong a

---

[17] The Court recognizes that at least one court has held that Eleventh Circuit opinions have been mixed. See United States v. Jefferson, No. 6:18-CR-59-ORL-31GJK, 2018 WL 6249848, at *3 (M.D. Fla. Nov. 29, 2018), aff'd, 824 F. App'x 634 (11th Cir. 2020). That said, the Court accepts the above-stated unpublished opinion for purposes of the pending motion to suppress and **INSTRUCTS** the Parties to provide additional briefing during the motions in limine stage of the case for purposes of trial objections and rulings.

stop." Id. "Unrelated inquiries are permitted so long as they do not add time to the stop." Id. at 882. Since a dog sniff is aimed at detecting evidence of ordinary criminal wrongdoing, "using a dog to search for contraband is not related" to a stop's purpose. Id. "[C]ourts must look at what an officer actually does: if he can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete [the stop's] mission."[18] Id. (citation modified, citations omitted, quotations omitted). And "a traffic stop prolonged beyond that point is unlawful." Id. (citation omitted). And the length of time a stop is prolonged is immaterial. Id. at 884.[19]

"The proper standard for addressing an unlawfully prolonged stop, then, is this: a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." Id. "In other words, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." Id.

---

[18] "The mission of a traffic stop is 'to address the traffic violation that warranted the stop and attend to related safety concerns[.]'" Campbell, 26 F.4th at 882 (citation omitted).

[19] In light of this authority, it is unclear if the United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004) opinion primarily relied upon by the Government contains the correct legal standard for purposes of this case.

In his objection, Defendant appears to challenge the following actions by the officers as unreasonably prolonging the stop: the search for weapons; the attempt to get Defendant to consent to a search of the vehicle; testing of the window tint thirteen minutes into the stop; and conducting an open-air search with the dog. Doc. No. [306].[20]

After review, the Court aligns with a recent unpublished Eleventh Circuit opinion which recognizes that a stop can have two purposes when there is an extensive law enforcement investigation of drug activities (including surveillance and intercepted calls) and a stop for a traffic violation pursuant to an arrangement with a local officer with a drug sniffing dog. See United States v. Martin, No. 24-11258, 2025 WL 1122683, at *3 (11th Cir. Apr. 16, 2025) ("It is clear in this case that the officer's purpose in conducting the stop was twofold: first, to investigate the officer's reasonable suspicion of a window tint violation, and second, to investigate the officer's reasonable suspicion that [the defendant] was transporting illegal drugs."). Similarly, here, the circumstances show that the

---

[20] Defendant also asserts that "[i]t was not obvious from the dashcam video of the stop if Swain ever checked Mr. Johnson's driver's license or checked for active warrants or inspected his registration and proof of insurance." Doc. No. [306], 13. However, Officer Swain's testimony provided confirmation that he used his computer to check license, registration, warrants, and insurance status. Doc. No. [272], Tr. 190, 199.

stop at issue had two purposes: (1) to investigate the officer's reasonable suspicion for weaving within the lane and a window tint violation and (2) to investigate the officers' reasonable suspicion of drug-related criminal activity.[21]

During the stop at issue, it was permissible for Officer Swain to ask routine questions about Defendant's itinerary, locate Defendant Johnson outside the car, and to search for weapons. See United States v. Campbell, 26 F.4th 860, 885 (11th Cir. 2022) ("Generally speaking, questions about travel plans are ordinary inquiries incident to a traffic stop."); United States v. Chandler, No. 24-10660, 2025 WL 85338, at *3 (11th Cir. Jan. 14, 2025) ("The lawful duration of a valid traffic stop is initially determined by the stop's 'mission,' which is to address the traffic violation that warranted the stop and attend to related safety concerns. And 'officers conducting a traffic stop may take such steps as are reasonably necessary to protect their personal safety.' Ensuring officer safety 'stems from the mission of the stop itself.'") (citations omitted); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993) ("Drug dealing is known to be extremely violent, and [patting a defendant down after he exited his truck] was a reasonable way for the agents to protect themselves from a possible concealed weapon.");

---

[21] The Court finds that there was reasonable suspicion even without considering the two challenged statements of Captain Sparacio.

<u>Martin</u>, 2025 WL 1122683, at *3 ("We hold that the officer permissibly stopped [the defendant's] car on the basis of his reasonable suspicion of a window tint violation, and permissibly asked routine questions related thereto for more than 5 minutes during which time he had relocated [the defendant] out of the car and into a location less risky to the safety of the officer."); <u>Chandler</u>, 2025 WL 85338, at *3 ("Given the danger to officers inherent in traffic stops, [the officer] was permitted as part of his mission in the stop to take the 'negligibly burdensome precaution' of asking [the defendant] to exit the car so that he could address [the defendant's] traffic violation.") (citations omitted).[22]

Officer Swain's testimony that Defendant Johnson was giving inconsistent/conflicting answers was also a reasonable basis for further investigation. <u>Cf.</u> <u>United States v. Harris</u>, 928 F.2d 1113, 1117 (11th Cir. 1991); <u>United States v. Paul</u>, 565 F. App'x 780, 783 (11th Cir. 2014).

After having observed the bag on Defendant's front seat (that was the subject of prior surveillance communicated on the group chat), Officer Swain also permissibly extended the duration of the stop to investigate a reasonable

---

[22] The Court also notes that some of the extended time was based on Defendant's conduct of agreeing to a search and later revoking it, after Officer Swain returned to his car to print the form.

suspicion that Defendant Johnson was involved in drug related activity. <u>Martin</u>, 2025 WL 1122683, at *3 (holding that where the circumstances showed that consent to search was declined and a K-9 was used to conduct a free air sniff of the car, "the officer permissibly extended the duration of the stop to investigate his reasonable suspicion that [the defendant] was transporting illegal drugs.").

"And of course, when the K-9 alerted, there obviously was probable cause to arrest [the Defendant] and search his vehicle." <u>Martin</u>, 2025 WL 1122683, at *3.

After *de novo* review, the Court concludes that the R&R is correct in law and fact. To the extent that the alternative probable cause finding controls, based on the traffic violations, the Court also finds that law enforcement did not unlawfully prolong or otherwise exceed the permissible scope of the traffic stop.

## IV.    OBJECTION 3

As stated above, Defendant's third objection is that all of his statements from the point that he was in handcuffs are inadmissible at trial. Doc. No. [306]. More specifically, Defendant asserts that "[f]rom the point where Mr. Johnson was first handcuffed during the stop and forward, he was in custody and deprived of his freedom of action under the totality of the circumstances as he

was not free to end the encounter and leave." Doc. No. [306], 14.[23]Defendant states that "[t]his is because a reasonable person associates with handcuffing with formal arrest." Id.

The Government did not brief the issue, but the transcript shows that at the January 2025 hearing, the Government acknowledged that "at some point during this police encounter, it goes from [the defendant] being detained . . . because he had a weapon . . . [and] there is an argument that . . . that the detention went to an arrest, a formal arrest." Doc. No. [272], 5–6. The Government acknowledges that the Court will not hear Miranda on the video evidence. Id. at 6. "[T]he Government concedes that from the time that [the Defendant] was arrested, any custodial interrogation, any of those statements, the Government does not plan to use any of those statements [for which] no Miranda was provided." Id. at 6. The Government did indicate that it planned to use the pre-custody statements, however. Id.

The Eleventh Circuit has held that "[n]o brightline test separates an investigatory stop from an arrest." United States v. Blackman, 66 F.3d 1572, 1576

---

[23] The R&R states that the Defendant only raised "fruit of the poisonous tree" arguments before the magistrate judge. Doc. No. [304], 14. However, because Miranda was raised at the hearing (Doc. No. [272], Tr. 6), the Court will proceed with consideration of the Miranda v. Arizona, 384 U.S. 436 (1966) arguments.

(11th Cir. 1995). "Instead, whether a seizure has become too intrusive to be an investigatory stop and must be considered an arrest depends on the degree of intrusion, considering all the circumstances." Id. The Eleventh Circuit has "concentrated on the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts relied upon by the officers." Id.[24] "[A]n investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave." Id. (emphasis omitted). "In addition, this Court has said the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest." Id.

---

[24] In an unpublished opinion, the Eleventh Circuit described the standard for traffic stops as follows:

> Ordinary traffic stops do not involve custody for purposes of Miranda, unless the stopped motorist is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). In determining whether a defendant's freedom was curtailed "to a degree associated with formal arrest," we consider the totality of the circumstances, including whether the officers brandished weapons or touched the defendant, whether the officers used a language or tone indicating that compliance with their orders could be compelled, and the location and length of the detention. United States v. Luna–Encinas, 603 F.3d 876, 881 (11th Cir.2010).

United States v. Ubaldo-Viezca, 398 F. App'x 573, 579 (11th Cir. 2010).

After review, the Court is unable to agree with Defendant's argument that the first time that he was placed in handcuffs to remove the weapon from his person, he was in custody so as to require the warning of his constitutional rights under <u>Miranda</u>.[25] As stated by the Eleventh Circuit, "[a]lthough a person would not feel free to ignore the directive to pull over or leave a traffic stop, ordinary traffic stops are more like <u>Terry</u> stops, which are not subject to <u>Miranda</u>, than formal arrests." <u>United States v. Tercero</u>, 859 F. App'x 506, 508 (11th Cir. 2021) (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 436-40 (1984)); <u>cf. United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1221 (11th Cir. 1993) ("The investigatory stop did not become an arrest merely because the agents . . . patted [the defendant] down after he exited his truck . . . .").

In addition, as stated above, the Eleventh Circuit "has said the fact that police handcuff the person or draw their weapons does not, as a matter of course, transform an investigatory stop into an arrest." <u>Blackman</u>, 66 F.3d at 1576. Especially in light of the video showing that the officers told Defendant that he was just being detained until they could get the gun off of him. <u>See</u> Gov't Ex. 14.

---

[25] "[T]he central principle established by [<u>Miranda</u> is]: if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 429 (1984).

27

The Court finds that the nature of the traffic stop changed after the K-9 alerted, Defendant's vehicle was searched, and the bag subject to prior surveillance was opened. There was probable cause to arrest Defendant for a drug crime and Defendant was handcuffed a second time with three officers on scene. These circumstances were sufficiently coercible to render Defendant in custody for Miranda purposes. See United States v. Johnson, No. 24-14083, 2026 WL 84476, at *6 (11th Cir. Jan. 12, 2026) ("Traffic stops may evolve, however, and the protections of Miranda must be observed 'as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'") (citation omitted); United States v. Vanderlinde, 140 F. Supp. 3d 1283, 1290 (S.D. Ala. 2015) ("[T]he encounter between the defendant and law enforcement was a Terry stop that did not ripen into an arrest until some point after cocaine was discovered on his person, at which time probable cause existed to support an arrest."). Any statements made after the second handcuffing (post-search of the vehicle) are suppressed. United States v. Taylor, 935 F.3d 1279, 1288 (11th Cir. 2019), as corrected (Sept. 4, 2019) ("The 'exclusionary rule'. . . operates to bar the admission of evidence obtained in violation of the Fourth Amendment.").

## V.    CONCLUSION

After *de novo* review, the R&R (Doc. No. [304]) is **ADOPTED with modification as indicated herein** as the Order of the Court as correct in law and fact. Defendant's objections (Doc. No. [306]) are **OVERRULED in part and SUSTAINED IN PART.** The Motion to Suppress Evidence (Doc. No. [120]) is **DENIED**. The Motion to Suppress Statements (Doc. No. [121]) is **DENIED IN PART AND GRANTED IN PART.** All statements of Defendant made after the second handcuffing (post-search) are suppressed. The statements occurring prior to such time are not suppressed as the evidence shows that said statements were voluntarily made.

A trial date will be scheduled at a later time by the Courtroom Deputy Clerk.

**IT IS SO ORDERED** this 11th day of February, 2026.

_____
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

29